UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| In re: | ) |
| | ) Chapter 7 |
| ZUHRY H. HASSAN and INOSHA HASSAN, | ) |
| | ) No. 03 B 36534 |
| Debtors. | ) |
| | ) |
| IRA BODENSTEIN, UNITED STATES TRUSTEE, | ) Honorable Susan Pierson |
| | ) Sonderby |
| Plaintiff, | ) |
| v. | ) Adv. No. 04 A 02977 |
| ZUHRY H. HASSAN and INOSHA HASSAN, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION

This matter came on for trial on the Complaint filed by Plaintiff, Ira Bodenstein, United States Trustee (the "U.S. Trustee"), objecting to the discharge of Debtors, Zuhry and Inosha Hassan, pursuant to subsections (a)(3) and (a)(5) of §727 of the Bankruptcy Code.

Debtors filed their joint Chapter 7 petition on September 5, 2003. In their Schedules of Assets and Liabilities, Debtors listed no ownership interests in real property and only $1,950.00 in personal property. They listed $1,500.00 as their average net monthly income and unsecured debts aggregating $189,600.16. In their Statement of Financial Affairs, Debtors did not list any gifts, transfers of assets, or losses for the one year period preceding the filing of their bankruptcy case.

-1-

At the trial, Debtors and the U.S. Trustee stipulated, *inter alia*, to the following facts, as set forth in the pretrial statement filed on April 26, 2005:

"4. ... The Debtors' signed their Petition, Schedules, and Statement of Financial Affairs on September 13, 2002, almost a full year before the case was filed.

...

8. On October 15, 2003, the first §341 Meeting of Creditors (the "Meeting") was commenced by the Chapter 7 Trustee. The Debtors attended and testified at this Meeting.

9. During the Meeting of Creditors, the Defendants testified that they used the credit cards for living expenses and that they lost some of the money gambling, notwithstanding that their statement of financial affairs failed to disclose any gambling losses.

10. Thereafter, the U.S. Trustee issued a document request to the Defendants pursuant to Bankruptcy Rule 2004 requesting that they provide documentation of all banking and credit card statements, gambling losses, federal income tax returns, and any other personal or business records.

11. The United States Trustee also issued Rule 2004 subpoenas to the Defendants' creditors in an attempt to obtain more complete documentation of the Defendants' substantial credit card debt. Subsequently, the U.S. Trustee received several responses.

12. The income levels stated by the Defendants in their Statement of Financial Affairs is [sic] substantially less than that provided on credit card applications by the Defendants:

   a. In April 1998, Zuhry Hassan's application with First USA Bank Visa stated that Zuhry was a cab driver with annual income of $50,000 and total assets of $100,000. This was inconsistent with his application one month later in May 1998, with Discover which stated that he was a student at the University of Central Oklahoma and an employee of McDonald's earning an annual salary of $28,000, where he had worked for the past two years.

   b. On October 21, 1999, the Defendants filed an application for a Citi Platinum Select credit card stating that their gross annual income was $75,800.

   c. On April 1, 2001, Defendant Inosha applied for an MBNA credit card stating that she had annual earnings of $45,000 as a secretary with other household income of $20,000. Defendant Inosha also stated that she owned her house with monthly payments of $1,000.

   d. In their Statement of Financial Affairs, the Defendants listed joint income for 2001 as $30,177, while their tax return for 2001 shows gross income of $20,177.

13.  Defendants' Schedules of Assets and Liabilities do not list any of the assets which, according to the Defendants' credit card statements and other records obtained by the U.S. Trustee, the Defendants had purchased or possessed since 2001. Among such assets are:

    a.  Fine jewelry purchased at Marshall Field's on August 9, 2002, in the amount of $2,882.63;

    b.  Watches, in the amount of $1,000 on May 16, 2002;

    c.  Three separate charges made in, or from a merchant designated as Singapore on January 14, 2002, in the aggregate amount in excess of $3,000;

    d.  Cash withdrawal from checking account on January 5, 2001, in the amount of $6,010;

    e.  Cash advances on five different credit cards from August 16, 2001 through October 19, 2001 in excess of $18,000;

    f.  Proceeds from the sale of a home in December 2001 in excess of $12,000; and

    g.  Outgoing international wire transfers in the amounts of $2,000 on May 13, 2002, and $3,000 on July 1, 2002."

The U.S. Trustee offered and the court received into evidence Exhibits 1 through 6, consisting of Debtors' Chapter 7 petition, their Schedules, their Statement of Financial Affairs, the credit card statements subpoenaed by the U.S. Trustee from the credit card companies, the Debtors' bank statements, and the records received in response to the U.S. Trustee's subpoenas to the casinos that Zuhry Hassan claimed to have frequented.

Debtors offered no documents into evidence at the trial. Debtor Inosha Hassan offered no testimony, as she was out of the country at the time of trial. Debtor Zuhry Hassan ("Hassan") testified on the Defendants' behalf.

Hassan testified that he is a cab driver and that his wife is unemployed. He has four children, ranging in age from six months to six years.

According to Hassan, his business suffered as a result of the events of September 11, 2001. Prior thereto, in 1999, he had purchased a taxi medallion for $71,000, of which he paid $10,000 as

a down payment and financed the balance. He also purchased the taxicab itself for $21,000, of which he paid $2,000 down. According to Hassan, his monthly payment for the medallion was almost $1,600 and for the vehicle, $650; with automobile insurance, gasoline, and other expenses, he paid a total of approximately $3,620 per month.

Hassan testified that after he paid off the entire $21,000 purchase price for the cab, it was stolen, and he purchased another one with the $10,000 he received in insurance proceeds. Later, in 2002, he purchased a Toyota van for $31,000, paying $2,000 down and financing the balance.

According to Hassan, his cabs were involved in a number of accidents, and approximately $25,000 of his credit card debt was incurred for vehicle repair. Hassan further testified that he was out of work for some time as a result of these accidents and had to use the credit cards to meet his living expenses.

In April or May of 2003, the finance company repossessed the Toyota van, as Hassan could no longer make the monthly payments. The medallion was also taken in 2003, when he still owed approximately $55,000 on it.

Hassan maintained copies of his receipts and other records related to his taxi business and produced them to the U.S. Trustee pursuant to subpoena at his Rule 2004 examination. He did not, however, maintain records of his alleged gambling losses and other personal transactions.

The only records that Hassan maintained that relate in any way to gambling activity were bank statements that have certain entries for cash withdrawals, apparently at or near casinos. (*See, e.g.*, Exhibit 5, showing, *inter alia*, two withdrawals of $203 each on January 7, 2001 labeled "Gamecash.")

The only other records that show any gambling activity are those that the U.S. Trustee

obtained on his own initiative through subpoenas to the credit card companies and the casinos. There are about four entries on the credit card statements showing charges made at Trump Casino in Indiana totaling approximately $3,000, including one for $1,055.99 on Hassan's November, 2001 "Gold MasterCard" statement. Hassan testified that he lost the $1,055.99 gambling. There is also a charge on his September, 2001 Gold Mastercard statement for $55.87 labeled "Barbary Coast Victoria" in Las Vegas. Hassan testified that he was in Las Vegas for four days and thought he lost about $10,000 while there. He stated that a $3,000 cash advance shown on the same statement constituted a portion of the money that he gambled.

The U.S. Trustee submitted as Exhibit 6 the responses that he received to the subpoenas issued to casinos allegedly frequented by Hassan. Although three of the five casinos that responded, i.e., Horseshoe, Trump, and Harrah's, appear to have identifying information about Hassan on file, only one of the three supplied any records of actual gambling activity, with wins and losses. Horseshoe Casino submitted records of three occasions on which Hassan gambled there, winning $400 on January 7, 2003 and $800 on February 1, 2003, and losing $200 on May 23, 1999. The other two casinos that were subpoenaed indicated that they had no responsive records concerning Hassan.

Although the Trump Casino had information about Hassan but no specific records of his gambling activities, the response indicated that win/loss information can only be captured when the patron chooses to use his player account card while gambling. Hassan's counsel urged that the lack of information was due to the fact that Hassan was not sophisticated enough to have a player's card.

Hassan listed no gambling losses on his Statement of Financial Affairs. Although Hassan testified at his §341 meeting that he had lost about $20,000 gambling, he testified at trial that the true

amount was about $40,000. He stated that he did not tell the truth at the §341 meeting, because his wife was with him, and he did not want her to know the extent of his loss. He also testified that when he took cash advances, he threw the receipts away to keep his family from discovering his gambling problem.

At one point, Hassan testified that all the cash advances that he took on his credit cards were used for gambling. However, he later acknowledged that he used cash advances for other purposes as well. When questioned about a $2,000 international wire transfer in May of 2002, Hassan testified that he sent the money, obtained from a cash advance, to his father in Sri Lanka.

Hassan did not list this transfer on his Statement of Financial Affairs. Nor did he list a $3,000 transfer to his sister in Sri Lanka. When questioned about a $3,000 international wire transfer in July of 2002, Hassan testified, "I think I paid that payment to my sister." He denied, however, that the money came from cash advances off his credit cards. When asked the source of the funds, he stated, "I think I take a loan from my friend."

Hassan's counsel asserted that these transfers did not have to be listed on the Statement of Financial Affairs, because they occurred more than one year before the filing of the petition in September of 2003. The transfers were, however, within the one year prior to the actual signing of the Statement of Financial Affairs in September of 2002, at which time Hassan certified that the answers were true and correct. Hassan's counsel contended that "signing the petition doesn't mean anything; filing it with the court, - - at the time that we filed it with the court, it should be honest and truthful ... ."

Another item not listed on the schedules and statements relates to the "fine jewelry" stipulated to have been purchased at Marshall Field's on August 9, 2002, in the amount of $2,882.63.

This item was an Omega watch purchased by Hassan on his wife's credit card. When asked what happened to the watch, he testified that he later exchanged it with someone from Sri Lanka for another watch, purportedly a Rolex. According to Hassan, the Rolex turned out to be a fake. Hassan testified that this happened in 2003.

Again, Hassan did not list the watch on his schedules, even though it was purchased shortly before he signed them in September of 2002. He also did not list the watch(es) purchased for $1,000 in May of 2002. Hassan testified on redirect examination that he nonetheless reviewed the schedules again in September, 2003, before they were filed, and that he did not own the Omega watch at that time, as it had been exchanged for a fake Rolex. Although Hassan claims to have reviewed the schedules shortly before filing, he did not list this transfer (or loss), which occurred within one year before the actual filing of his petition, on his Statement of Financial Affairs.[1]

The U.S. Trustee asked Hassan what was obtained through the three separate charges, aggregating over $3,000, that were stipulated to have been made in, or from a merchant designated as "Singapore" on January 14, 2002. Hassan implied that these charges, which were made on his "Citi Aadvantage World MasterCard," were invalid, testifying that since 1999, he had not gone out of the country. He admitted, however, that he had not challenged the charges with Citibank.

Finally, with reference to the stipulated fact that the income levels on the Statement of Financial Affairs are substantially less than those provided on credit card applications, Hassan admitted that he had overstated his income on some of the applications.

The only other witness called by Debtors was Faheem Rafdeem, Hassan's father-in-law, i.e.,

---

[1] The court notes that although Hassan claimed to have reviewed his petition and related documents in September of 2003, before they were filed, he nonetheless listed the 2002 Toyota van, which had already been repossessed in April or May, as "Property to be Retained" in his Statement of Intention. (*See* Exhibit 1)

-7-

father of Debtor Inosha Hassan. Debtors called Rafdeem to corroborate Hassan's testimony concerning his gambling. Rafdeem testified that he saw Hassan at the casino many times and observed him withdrawing cash.

## DISCUSSION

The U.S. Trustee, as plaintiff in this action, must prove every element of his objections to discharge by a preponderance of the evidence. *In re Scott*, 172 F.3d 959, 966-67 (7th Cir. 1999). Section 727(a) of the Bankruptcy Code "denies a discharge to debtors who have been unscrupulous in various ways." *In re Olbur*, 314 B.R. 732, 740 (Bankr. N.D. Ill. 2004). The bankruptcy discharge is intended for the "honest but unfortunate debtor," *id.* (citing *Grogan v. Garner*, 498 U.S. 279, 287, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991); it is not intended for the debtor who has been less than honest. *Id.* (citing *Village of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002).

The U.S. Trustee's complaint sought denial of discharge in two counts. Count I sought denial under §727(a)(3) of the Bankruptcy Code, and Count II sought denial under §727(a)(5).

Section 727(a) provides that the court must grant the debtor a discharge unless, *inter alia*,

>    ...
>    (3)    the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
>
>    ...
>    (5)    the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities
>    ... .

Section 727(a)(5) is "broadly drawn and clearly gives a court broad power to decline to grant

a discharge in bankruptcy where the debtor does not adequately explain a shortage, loss, or disappearance of assets." *In re Mantra*, 314 B.R. 723, 730 (Bankr. N.D.Ill. 2004) (quoting from *In re Martin*, 698 F.2d 883, 886 (7th Cir. 1983)). The proof, under §727(a)(5), proceeds in two stages. First, the objecting party must prove that the debtor once owned substantial and identifiable assets that are no longer available for satisfaction of his liabilities. *Mantra*, 314 B.R. at 730; *see also Olbur*, 314 B.R. at 740. Once this burden is met, the debtor must provide a satisfactory explanation for the loss. *Id*.

Whether an explanation is "satisfactory" is left to the discretion of the court. *Mantra*, 314 B.R. at 730; *Olbur*, 314 B.R. at 741. While the explanation need not necessarily be comprehensive, it should be supported by at least some documentation, and the documentation must be sufficient to eliminate speculation at to what happened to the assets. *Mantra*, 314 B.R. at 730 (citing *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 956 (Bankr. N.D.Ill. 1995)). The explanation must consist of more than a "vague, indefinite, and uncorroborated hodgepodge of financial transactions." *Id*. (citing *Baum v. Earl Millikin, Inc.*, 359 F.2d 811, 814 (7th Cir. 1966)). While the debtor need not demonstrate the wisdom of his disposition of assets, the court must be convinced of the completeness and truth of his explanation. *Olbur*, 314 B.R. at 741.

In this case, the U.S. Trustee met his burden of demonstrating that the Debtors once owned substantial and identifiable assets that are no longer available, including, *inter alia*: the watches stipulated to have been purchased in May and August of 2002, over $12,000 in proceeds from the sale of a home stipulated to have been received in December, 2001, and over $18,000 in cash obtained through credit card advances during a two month period ending October 19, 2001.

Hassan's explanation of the disposition of his assets was not satisfactory. The court found

Hassan's testimony concerning the disposition of his Omega watch to be not only not credible, but contrived. The court further found Hassan's testimony concerning the alleged loss of $40,000 gambling to be lacking in credibility. His testimony at trial, which was inconsistent with his testimony at the §341 meeting, was vague, indefinite, and largely uncorroborated. While there is some corroboration of the fact that he has gambled, there is little or no corroboration of the extent of any losses, - - particularly a $40,000 loss. Indeed, at least two of the casinos that he claimed to have frequented had no records of his gambling there at all.

Hassan's attempt to corroborate his testimony through the testimony of his father-in-law also fails. Although Rafdeem testified that he observed Hassan gambling and withdrawing cash, Rafdeem was not present on all the occasions and cannot testify as to how much cash was withdrawn and how much was actually lost gambling. Moreover, the court found Rafdeem's testimony to be lacking in credibility.

Hassan's further attempt to explain his loss of assets through the decline in his taxi business after the events of September 11, 2001, his vehicle accidents, and his other business misadventures is also unavailing. Even assuming that Hassan suffered losses as a result of such events, they do not explain what happened to the assets in question. Again, the court is not required to sift through a vague and disorganized hodgepodge of transactions to trace the whereabouts of particular assets; it was Hassan's burden to do so.

The court is simply not convinced of the completeness and truthfulness of Hassan's explanation. Accordingly, his discharge will be denied pursuant to §727(a)(5).

The U.S. Trustee also seeks denial of discharge pursuant to §727(a)(3). As indicated above, §727(a)(3) provides for the denial of discharge where the debtor, *inter alia*, has "failed to keep or

preserve any recorded information ... from which the debtor's financial condition or business transactions might be ascertained," unless the failure was justified under all the circumstances. The purpose of this provision is to make the privilege of discharge dependent upon a true presentation of the debtor's financial affairs. *Peterson v. Scott (In re Scott)*, 172 F.3d 959, 969 (7th Cir. 1999). Under §727(a)(3), debtors are to "produce records which provide creditors 'with enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present.'" *In re Juzwiak*, 89 F.3d 424, 427 (7th Cir. 1996) (quoting from *In re Martin*, 141 B.R. 986, 995 (Bankr. N.D.Ill. 1992)). When the debtor is involved in business dealings, he is held to a higher standard of record-keeping. *Union Planters Bank, N.A. v. Connors (In re Connors)*, 254 B.R. 230, 235 (Bankr. S.D. Ill. 2000), *aff'd*, 283 F.3d 896 (7th Cir. 2002). Indeed, it has been noted that §727(a)(3) "is not designed to bar the discharge of an ordinary consumer debtor." *In re Hansen*, 325 B.R. 746, 762 (Bankr. N.D.Ill. 2005) (citing *Scott*, 172 F.3d at 970; *In re Peterson*, 296 B.R. 766, 789 (Bankr. C.D.Ill. 2003)). However, in the non-ordinary consumer case, *e.g.*, where there has been "a 'sudden and large dissipation of assets,'" then a lack of records will warrant denial of discharge under §727(a)(3). *In re Self*, 325 B.R. 224, 240 (Bankr. N.D. Ill. 2005) (quoting from *In re Buzzelli*, 246 B.R. 75, 98 (Bankr. W.D.Pa. 2000)); *Hansen*, 325 B.R. at 762.

Here, Hassan maintained receipts and other records related to his taxi business, but the only records that he produced relating to his personal transactions were certain prepetition bank statements, and even those failed to cover the nine month period preceding the commencement of this case. Although the U.S. Trustee, through his own initiative, was able to obtain copies of Hassan's credit card statements and certain information from a number of casinos, the documents

still do not provide creditors with sufficient information to "track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." *Juzwiak*, 89 F.3d at 427. Accordingly, denial of Hassan's discharge is also warranted under §727(a)(3).

As for Debtor Inosha Hassan, although she did not appear at trial, the court finds that the U.S. Trustee's proofs are insufficient to warrant a denial of her discharge under §727(a)(5). The substantial and identifiable assets that are no longer available to creditors appear to have been largely owned or possessed by Hassan, and not by his wife. Moreover, as the "sudden and large dissipation" of such assets was likely brought about by Hassan, the court is not inclined to deny his wife's discharge under §727(a)(3), even though the records produced by her were incomplete.

Indeed, even if the court were to find the U.S. Trustee's proofs adequate, the court would nonetheless weigh the equities and grant Debtor Inosha Hassan's discharge. *See Union Planters Bank, N.A. v. Connors*, 283 F.3d 896, 901 (7th Cir. 2002) (bankruptcy court has discretion to grant discharge even where grounds for denial are demonstrated). Inosha Hassan is a housewife with four children and appears to have had little involvement in any wrongdoing that may have taken place in this case. To leave her overwhelmed with almost $190,000 in unsecured debt would, under all the circumstances here, be inequitable.

Accordingly, the U.S. Trustee's objection to discharge will be denied as to Debtor Inosha Hassan.

## CONCLUSION

For all of the foregoing reasons, and pursuant to Federal Rule of Civil Procedure 58, incorporated herein by Bankruptcy Rule 9021, the court will enter judgment on the complaint in favor of the United States Trustee and against Zuhry Hassan, denying his discharge under §§727(a)(3) and (a)(5) of the Bankruptcy Code. As to Debtor Inosha Hassan, the court will enter judgment on the complaint against the United States Trustee and in favor of Inosha Hassan, granting her a discharge in accordance with §727(a) of the Bankruptcy Code. This opinion constitutes the court's findings of fact and conclusions of law in accordance with Bankruptcy Rule 7052.

Date:  NOV 1 5 2005

ENTERED:

SUSAN PIERSON SONDERBY
United States Bankruptcy Judge